Next case on for argument is United States versus McFadden, Brown and Germany. Oh, I'm sorry. Excuse me. My apologies. Sorry. The Estate of Jaquez versus City of New York. No, my, my. Sorry, folks. Get that, get that pulse rate up for the next case. Mr. Onuma. Yes, thank you very much, Your Honor. Good morning. May it please the Court. My name is Zachary Margolis Onuma. And I represent the two plaintiffs, Anna Martinez and the Estate of Jaquez, as represented by the Public Administrator of Bronx County. The week before the trial began, we had our materials due on a Monday. Our joint pretrial order, which included our entire set of exhibits, our, a summary of each witness and various other materials. That very day, we were informed by the district court that there would be no trial, that the court had changed its mind, and that summary judgment would be granted in toto to the defendants. The decision that came down a couple of weeks later changed that back and delivered a summary, what I consider an odd summary judgment decision that recognized that there were six deadly shots fired, or potentially deadly shots fired, but granted summary judgment only with respect to the first five and let us go to trial on the last shot. It also dismissed or granted summary judgment with respect to the initial uses of force that started the assault on my client's husband, Mr. Jaquez. I think the easiest way for you all to resolve this case is to have a look at that summary judgment decision, because that would knock out the trial issues as well. So the summary judgment decision is clearly wrong and ignored relevant, admissible, and persuasive evidence with respect to at least two moments in the earlier conflagration. May I ask you, because this is a very complicated set of interlocked decisions, it occurred to me that perhaps a place to start, and I don't want to tell you where to start your argument, but it is with the exclusion of the expert testimony. Because if the expert testimony were included, that would change the dynamic somewhat in your favor with respect to the summary judgment motion as well as, you know, with respect to anything that happened at trial. Am I wrong about that? No, I think that's correct, and I think that's how the district court analyzed it. However, I think we get past summary judgment with or without the expert, and that's the point. And the point, let me just say it real quick two times. The point is that when the initial phasers were fired, the officers had already been told that Mr. Hawkes was trying to surrender and was unarmed. Now, they say they didn't hear that, the officer who fired the phaser. But there is clearly an issue of fact for the jury and a bona fide dispute over whether or not they knew he was armed. Let me just ask about that. I thought that you're referring to what Officer Cannizzaro said. Correct. Did he say he's unarmed, or did he say, I don't see a knife? He said, I saw him put the knife down, and there's nothing in his hands. And I'm paraphrasing. Isn't that at an earlier point? Then he comes out, and I thought Cannizzaro said, I didn't see his hands at that point. No, that's at a later point, Cannizzaro's out of it. And the officers who fired claimed they couldn't see his hands. But that is a dispute with what Cannizzaro had informed them. Cannizzaro can't see it anymore, though, right? He's not looking at that scout camera anymore, right? I mean, he said, I saw him either put the knife in a toilet or left his hands. Right. But that's when he stopped watching. So how is that inconsistent with the other police officers saying, well, he obviously retrieved the knife because we all saw it in his hand. Cannizzaro didn't say, and then I watched the whole altercation. And when they were firing the rubber bullets, the taser, the 9 millimeters, he didn't have a knife either. He went back, and one of the officers said this in his departmental interview. There is evidence that Mr. Jaquez went back and got the knife from the toilet. He comes out unarmed, and he goes back, and that's in the record. So what Cannizzaro sees is that initial taser shot. That's what I'm focusing on here. There's one other point about that I forgot, but maybe it will come to me. I guess my question is, how is that inconsistent with what the other officers said who were on the scene? Because Cannizzaro can't see it anymore or isn't watching anymore, right? Because we're breaking it down quite finely, and the initial tasering happened at that time when he's coming down the hallway. Cannizzaro says unarmed. The officers say they can't see his hands. And there's more testimony, in fact, that the tasering was immediately when he showed himself. So that's while Cannizzaro was still watching on the scout. And again, this is for summary judgment purposes. These are issues for the jury to resolve, and I would be better prepared for a closing at a trial pointing out each one. The same goes, Judge, the district court ignored the argument that during the initial volley of shots, the decedent's arm was back. That there was a hole going from his bicep into his side and lodging on his left side. There are many ways to explain that. Certainly one of them is that he was down on the floor pushing up, which was observed, they claim, observed later. The officers all testified that at the time of the initial volley of shots, his arm was out. So that's inconsistent. My client's husband is dead. My only witness on the scene is dead. So I have to argue from that circumstantial evidence that at the time of those initial shots, he wasn't posing an immediate threat, given the armor and the relative positions of the officers. So, I mean, I think that's the summary judgment decision. If you add to that the experts, so we were, there was a game of ping pong with the experts, where I think a clear double standard was imposed. Our expert, who's an emergency room physician with 25 years treating trauma, was not permitted to testify about the effects of trauma. Whereas at trial, I was sandbagged, and there was the autopsy doctor, who was a city employee, was permitted to testify about the effects of trauma, despite the fact that she hadn't seen a live patient since medical school. How were you sandbagged when you called her on direct? I'm sorry? You called her as a witness. Right, but not as- And asked her for a bunch of conclusions about the cause of death, about whether at the time he was handcuffed he was still alive because of the bruising on his wrists, the impact of the rubber bullets. You asked that of Dr. Latta yourself. How was that sandbagging when they said, well, could he push himself up at the time, and you didn't object? Because, well, I made a mistake. There's two questions. I made a mistake in not objecting. I have to face plain error on that lack of objection. The second one, could he have had a knife in his hand, I certainly did object. Yes. And so going back to the original portion of that question, the reason it's sandbagging is because everything I asked her about was right in the autopsy report. And I didn't call her as an expert. I didn't qualify her as an expert. I called her to testify about her observations and her lay testimony. Those are expert observations regardless. I'm sorry? Those are expert observations regardless. I mean, the average Joe off the street can't come in and do an autopsy and inform a citizen about it. She's not my expert, and they're based on her. You asked her how does the diaphragm work for the lungs. You asked her what a mushrooming-type bullet does. There were all these other questions that just weren't confined to the autopsy report she prepared. Do you concede that? I concede that. I don't concede that those are opinions. How a mushrooming bullet works is a matter of opinion. How about whether he was alive at the time he was handcuffed? Is that an opinion? That's an opinion, yes. As we stand here today, I don't recall asking that. I believe you if I did. I'm not contradicting it. The point is, though, the final and key opinions were brought out by the city about how he would have behaved when he was alive. Let me give you the question. This is about the scraping on the wrists, right? Do you have a theory about what caused those? Is that an opinion question? That was in the autopsy report, Your Honor. It said consistent with handcuffing. So the question is, was he alive at the time? That's what you were pursuing. Right. And that's something that is in the ken of an autopsy doctor, not an emergency room doctor. How strong someone is after they've been shot is a classic area for an emergency room doctor to testify about. An autopsy doctor only deals with dead bodies. So it's a little bit of a different analysis. I think my time is up, but I'm happy to. You've reserved three minutes. Yes, I have. So you will have all of those. Thank you. Ms. Paulson. Thank you, Your Honors. May it please the court. Susan Paulson on behalf of the city defendants. Your Honors, officers here were confronted with an extremely difficult situation in which they had an armed and violent and intoxicated, emotionally disturbed person. When they arrived at the scene, they spent in excess of an hour trying to negotiate to persuade Mr. Hawkins himself started to approach the officers who had carefully sequestered themselves in another part of the apartment. And was defying their orders to show his hands that one of the officers first used a taser. From that moment until the tragic ending in this case, at most 20 or 30 seconds expired. And in that time, the officers used a graduated force trying to get Mr. Hawkins to surrender or back off, starting with tasers. And then when he was attacking Flood with a knife, then used the rubber bullets. And then when he was attacking McNamee with a knife and they could not get him off. Only then, at the very end of this, did they resort to live fire. Now, this all, as I said, transpired exceedingly quickly after the hour and a half that they spent trying to persuade him to surrender. And during that time, Officer Canazaro was observing with the small scout camera. And during that time, he saw Mr. Hawkins alternately picking up and putting down the knife. Walking back and forth between the kitchen, I'm sorry, the bathroom and the bedroom. And picking up the knife and putting down the knife, and picking up the knife and putting down the knife. And he was reporting a play by play to the ESU officers. And the ESU officers were aware that Mr. Hawkins was uncertain as to what he wanted to do. When Mr. Hawkins then finally started to approach them, it was reasonable that the officers were unsure whether in fact he had put down the knife. It is correct that Canazaro did not see the knife in Mr. Hawkins' hands. But certainly on this record, no reasonable juror could find that the officer's judgment was so flawed in being concerned that he might still have the knife in his hand, that no reasonable officer would have made a similar choice. When he's approaching and defying commands to show his hands, that no reasonable officer would have made that choice. Am I right that Officer Canazaro didn't see the actual fighting that went on that led to the fire and the fatal shot? Is that right? That is correct. Why was that? Did the scout not see that area or did he turn off the scout? What happened? I believe the testimony was that he actually left. After Mr. Hawkins started to approach the officers, he was in view and they were no longer using the camera to observe his moments. And I believe that Canazaro's testimony was that he actually left. He did not, you're correct, that he did not observe any of the uses of nonlethal force or the live fire. Your Honors, not only is there no disputed issue of fact as to whether he was defying the commands to show his hands, but there was nothing on the face of the autopsy report that was inconsistent with the officer's testimony about the manner in which Hawk was attacking, first Flood with the knife and then McNamee with the knife. This isn't a situation in which the officer said he was charging us and we shot him and the autopsy shows that the shot was to the back. Then the autopsy would contradict the evidence and there would be a disputed issue of fact. But here, Dr. Landy said you cannot tell the body positions from the autopsy. The autopsy on its face to a lay person without an expert to interpret it, there was no expert to say that this autopsy showing the exit and entry points of the bullets and their trajectories contradicted the testimony of the officers. There was an expert but he was excluded. That is correct, Your Honor. Dr. Sullivan did think that you could tell the body positions from the bullet trajectories, didn't he? He did, Your Honor. What renders him incompetent to testify to that? Well, Your Honor, he himself admitted that he had to consult a forensic pathologist because he lacked expertise, that he had no experience in crime scene reconstruction, that he had no experience in psychiatry. So he admitted he was unqualified in those ways. Psychiatry is a different issue. That's got to do with how do you handle injuries. Yes, Your Honor. But with respect to this, I guess I'm just wondering, is there some authoritative text or precedent as to what an ordinary medical doctor with experience treating bullet wounds is able to say about things like bullet trajectories? Right. Your Honor, I don't know. And certainly Dr. Sullivan cited to no studies or testing in his report. He said that his conclusions were self-evident, that they were based on geometry, common sense opinion, and the absolute gospel truth. And his opinions in his report were based on his personal interpretation of limited evidence, the autopsy report, excerpts of the depositions. And he said his experience as a wrestler that informed him as to body positions. And Dr. Landy's testimony that you can't tell the body positions, what is that based on? She testified that she could only tell the trajectory of the bullets, which only indicated how they were holding the firearm. But she said from it she couldn't necessarily draw a conclusion as to whether Mr. Hockwas might have been bending over. There was testimony that he was on top of mactamy at one point. And she said that she could not conclude from what she had, which was merely the autopsy report, what the body positions were. She didn't think the report lent itself to that conclusion. So was Dr. Landy an expert witness or a lay witness? Dr. Landy was a lay witness. If she's a lay witness then under the Bank of America case, she can only testify about the product of her own investigation, right? That's correct, Your Honor. How about these questions about whether he could push up and whether he could hold on to the knife right before the final shot? Were they a product of her investigation? They were, Your Honor. What she was testifying to was the entry and exit points of the bullets and how they affected the body. So she testified that one entered the chest muscle and the various ways and then was asked would that affect in terms of the workings of the human body, like nothing had severed the spine. Nothing had created a situation that would prevent a person. She couldn't say, you know, what Mr. Hawkins's capabilities were, but she was testifying from the examinations that she had done of the ways in which the specific bullets had impacted the musculature, the spinal cord and the systems of the body. And I thought she did testify to what his capabilities were, that he would have been able to do certain things. She said, yes, that it would be possible to still push up with those injuries, yes. I'm sorry if I was confusing on that. I'm sorry. I thought you just said that she wouldn't be able to testify to his capabilities. I guess I'm sorry. What I was trying to say is that she wasn't saying what she thought Mr. Hawkins was or was not doing. She was merely saying that with these injuries, would the human body still be able to perform that motion? And her conclusion from her autopsy report was that it would. And why is Sullivan not capable of testifying to that fact? Well, Your Honor – Because this sounds to me more like either you need to be some extraordinary specialist in the effects of wounds or it's something that ordinary doctors can testify to, because I didn't think that Landy claimed any such expertise. Well, Your Honor, what Dr. Sullivan wanted to testify to, what his proffered opinions were in his expert report, was that the officers were lying about Mr. Hawkins' body position. I understand that there were several things he purported to testify to. And some of them, it seems to me, that it's not just not an abuse of discretion, but at least from where I sit, would be clear calls that he wouldn't be able to testify to that. But then there are others. Don't you divide it up and ask, well, is he able to testify to this? But he wasn't offering an opinion on that. What he offered an opinion on were three things, the handling of an emotionally disturbed person, the trajectories of bullets, and whether the officers lied that Mr. Hawkins was not already on the ground when live fire was deployed. And at the moment I'm losing sight of everything. But his reason, though, for why he thought the officers were lying, and maybe this is parsing it too closely, I don't know, maybe you're going to say this is just district court's discretion, but one might have thought you would strike the conclusion about who's telling the truth, which is not the province of an expert, but his underlying purported facts that there's no way that Mr. Hawkins could have done what the officers said they saw him do would be within his expertise. But his basis was, he said, geometry and common sense opinion. He wasn't basing it upon any expertise that he may or may not have from a long career in medicine here. It certainly was not manifestly erroneous for the district court to exclude his opinion under those circumstances. And as Judge, the court has already pointed out, it was the plaintiff, Dr. Landy was the plaintiff's witness, and the plaintiff had asked Dr. Landy not only if she had a theory about the bruises on his hands, had asked about the effects of the wounds on the supplemental appendix on page 1899, what would be the effects of the bullet wounds to the aorta. And given that, when they made a general objection, it was not clear what they were objecting to, which subjects it to plain error review if reviewed at all, which means that it has to go to the very integrity of the trial. And here, it did not go to the integrity of the trial because there was no contrary evidence. The only evidence here was the officer's testimony that Mr. Hawkins was pushing up and was grasping the knife when the live fire was used. Thank you, Ms. Paulson. Thank you very much. I want to use my three minutes to be totally clear about what the aspect of Dr. Sullivan's testimony that were appealing and that he would have testified to at the trial, because I think it does go to the integrity of the trial. Dr. Sullivan is an emergency room physician. He deals with trauma, and what he was going to testify to was that Mr. Hawkins, having been shot already three times with two bullets in him, having been shot four times, would have been significantly impaired and unable to This is the section on A164 to 165 labeled effects of the wounds. That's what you're now talking about. That sounds right, yes. That was the third point that my adversary, that we offered him for as an expert witness. I mean, it's sort of the conclusion section lists three things, but one of them is that he posed no conceivable threat to anyone after wound F was inflicted. And there's a whole two paragraphs preceding that labeled effects of the wounds that discusses why he gives that conclusion. That's different than his other opinions as to where Mr. Harkez was positioned. Correct. Totally different. Totally separate. And within the real core of areas that he's been qualified on in the Southern District before, and within the core of what he does day in and day out is he sees live people and he sees how different wounds affect them and he treats them in the first 30 minutes. That's what emergency medicine is. And as I think you pointed out, what we're really talking about here is a double standard. A double standard, I must say, that's all the more disturbing because my client is indigent and our resources were very limited in terms of what we were able to do. I can recognize here that we pushed Dr. Sullivan's expertise because he was available to me at a very limited cost for reasons that the city constantly pointed out to the judge. But the point about how would it affect this man as he's lying on the ground, would he have been able to actually stab the officers, that's within his core of expertise. And that's the key question at trial was was he actually posing a threat to the officers when they shot him in the back of the head. That's different than what the key question is at summary judgment, I take it, which goes to is there anything that Dr. Sullivan could contribute on the question of where was he when the first shots were fired? I think that's correct, Your Honor. And in terms of that, I would like to also just point out that the defendants offered a crime scene reconstruction expert who was someone sort of an ex-police officer with experience and that we didn't object to it because we thought that the conclusions, that it would be helpful to reconstruct based on the trajectories and we thought the conclusions were sort of obviously ridiculous because they had never been, it supported a theory of the case that the officers didn't testify to. The judge did exclude that expert anyway, but again, I think what she did was she held everybody except for Dr. Landy to an impossibly high standard. Thank you. Thank you. Thank you both. We'll reserve decision in this case.